JGK**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

─────────────────────────────────

**VIBES INTERNATIONAL INC., SAL,**

                    **Plaintiff,**              18-cv-11449 (JGK)

          **- against -**                        <u>MEMORANDUM OPINION &</u>
                                                 <u>ORDER</u>
**ICONIX BRAND GROUP, INC., et al.,**

                    **Defendants.**

─────────────────────────────────

**JOHN G. KOELTL, District Judge:**

     The plaintiff, Vibes International Inc., SAL ("Vibes"),
brings this diversity action against the defendants, Iconix
Brand Group, Inc. ("Iconix") and IP Holdings Unlimited, LLC ("IP
Holdings"), alleging various New York State law contract and
tort causes of action based on allegations that the defendants
made various misleading statements regarding their mutual
business relationship while interfering with Vibes's
relationships with third-party customers. The defendants now
move to dismiss the Second Amended Complaint ("SAC") pursuant to
Federal Rule of Civil Procedure 12(b)(6) for failure to state a
claim. For the reasons that follow, the motion is **granted in
part** and **denied in part**.

                              **I.**

     In deciding a motion to dismiss pursuant to Rule 12(b)(6),
the allegations in the complaint are accepted as true, and all
reasonable inferences must be drawn in the plaintiff's favor.

See McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." ¶When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

**II.**

The following allegations are accepted as true for purposes of this motion to dismiss.

**A.**

Vibes is a foreign corporation organized under the laws of the Republic of Lebanon with its principal place of business in Lebanon. SAC ¶¶ 4-6. It has operated for over thirty years as a licensee for several international brands, including Point Zero Apparel, Basse Mixed Nuts & Dried Fruits, and Ecko Unltd. Apparel. Id. at ¶ 7. On November 29, 2013, Vibes entered into an exclusive license agreement with IP Holdings for a term continuing through December 31, 2020. Id. at ¶¶ 39, 49.

IP Holdings is a limited liability company organized under the laws of Delaware with its principal place of business in New York. Id. at ¶¶ 13-14. Among other things, IP Holdings manufactures and markets apparel and lifestyle products worldwide, such as outerwear, footwear, adult and junior clothing, and skate accessories. Id. at ¶ 15.

Iconix is incorporated in Delaware and has its principal place of business in New York. Id. at ¶¶ 8-9. Iconix is a brand management company that licenses brands to retailers throughout the United States and worldwide. Id. at ¶¶ 10-12. Iconix is the sole owner of IP Holdings. Id. at ¶¶ 36-37. IP Holdings and

Iconix share the same office and employees such that every
person from IP Holdings that interacted with Vibes during the
relevant period in this case was a representative and employee
of both IP Holdings and Iconix. Id. at ¶¶ 44-45.

The agreement between Vibes and IP Holdings signed on
November 29, 2013 granted the plaintiff an "exclusive license"
to use the marks "ECKO UNLTD," "MARC ECKO CUT & SEW," and "ECKO
UNLTD MMA" throughout Kuwait, Qatar, Saudi Arabia, United Arab
Emirates, Bahrain, Oman, Yemen, Lebanon, Syria, Jordan, Iraq,
Iran, Egypt, and Libya (collectively, "the territory")
"[s]ubject to the terms, conditions, and limitations of [the]
Agreement." Weingart Decl., Ex. A, § 1.1(a). The agreement
specifies that "[n]othing herein shall be deemed to prevent [IP
Holdings] or its affiliates or third party licensees from
manufacturing or having manufactured Products bearing the
Licensed Marks in the Territory, provided that such products are
not sold to customers located in the Territory except as
otherwise permitted hereunder." Id. § 1.2(b). In a letter dated
March 7, 2015, Legal Counsel and Director for Iconix Alyssa
Perlowitz further confirmed that Vibes "is authorized on an
exclusive basis to manufacture, advertise, promote, market
distribute, and import" licensed products in the territory. SAC
¶ 43.

4

The agreement obligated Vibes to pay to IP Holdings
royalties equal to ten percent of its net wholesale sales of the
licensed products. Weingart Decl., Ex. A., § 8.1. Furthermore,
Vibes guaranteed that its wholesale sales would reach specified
minimum amounts for each year of the agreement. Id. § 8.6,
Sched. C. In the event that Vibes failed to meet these minimum
amounts, IP Holdings was expressly entitled to terminate the
agreement. Id. § 17.2(f). In subsequent amendments to the
agreement, the royalty and minimum sales obligations were
reduced. See SAC ¶¶ 68-71. For example, the First Amendment to
License Agreement, executed on June 23, 2016, reduced Vibes's
royalty obligation to eight percent of net wholesale sales, and
the minimum wholesale sales obligations were reduced for 2017
and 2018. See Weingart Decl., Ex. B, at 2.

Although the agreement granted Vibes an exclusive license
to use the marks in the territory, it expressly reserved certain
rights to IP Holdings regarding the use of the marks in the
territory:

> Notwithstanding anything to the contrary contained in
> this Agreement, Licensor and its affiliates may at any
> time during the Term negotiate and enter into
> agreements with third parties pursuant to which any of
> them may grant a license to use the Licensed Marks in
> connection with the manufacture, distribution and sale
> of Products in the Territory. Nothing herein shall be
> construed to prevent Licensor, its affiliates or any
> third party licensee from showing such Products and
> accepting orders therefore prior to Termination.
> However, the first seasonal collection of Products

5

<u>bearing the Licensed Marks sold shall be a collection</u>
<u>after the final collection sold by Licensee hereunder</u>.
Also, if Licensor or any of its affiliates elects to
manufacture, distribute and sell in [sic] Products in
the Territory bearing the Licensed Marks after the
final seasonal collection sold by Licensee hereunder
itself or through an affiliate, rather than through a
third party licensee, <u>Licensor and/or any such</u>
<u>affiliate may show, advertise and market, accept</u>
<u>orders for and ship its Products in the ordinary</u>
<u>course prior to Termination.</u>

Weingart Decl., Ex. A, § 23.3 (emphasis added).

The agreement included a no oral modification clause, which

provides that the agreement "may not be modified, discharged or

terminated, nor may any provisions hereof be waived, orally."

<u>Id.</u> § 23.4. The agreement also provided that, in the case of a

force majeure event, "[n]o party . . . will be liable for the

failure to carry out its obligations. . . Act of war and act of

revolution are considered Force Majeure." <u>Id.</u> § 24.

**B.**

In 2015, Daniel Castle, Vice President of International

Licensing at Iconix and IP Holdings, allegedly approached a

customer of Vibes that operates stores throughout the United

Arab Emirates. SAC ¶¶ 81-82. Castle allegedly persuaded the

customer to cease conducting business with Vibes. <u>Id.</u> at ¶ 81.

Vibes's sales to that customer then dropped from over $600,000

in 2014 to about $225,000 in 2015 and $0 thereafter. <u>Id.</u> at

¶ 107. In response, Vibes allegedly sought and received multiple

6

assurances from representatives of IP Holdings that such an incident would not happen again. Id. at ¶¶ 87-90.

In 2016, the plaintiff was unable to meet its minimum wholesale sales obligations. See id. at ¶ 83. During that time and in the years preceding, different countries in the territory witnessed several wars and revolutions. Id. at ¶¶ 128-40. IP Holdings' Regional Representative Marc Newman allegedly told the plaintiff "don't mind the minimum wholesale obligations as long as Vibes is paying to Iconix the full Minimum Royalties obligations" on multiple occasions throughout 2016 and 2017. Id. at ¶ 66. On or about March 24, 2017, Newman and General Manager for Iconix Abdullah Al Jarrah also allegedly reassured the plaintiff that the relationship between the companies would "not be disturbed." Id. at ¶ 173.

Vibes alleges that, between June and November 2017, Newman and Al Jarrah met with representatives of various third-party customers of Vibes that operated stores in the territory. Id. at ¶¶ 94-104. Newman and Al Jarrah asked the customers to stop conducting business with Vibes and, in some instances, offered the customers direct licensing agreements with the defendants. Id. Several customers stopped conducting business with Vibes, and sales dropped in 2017. Id. at ¶¶ 106-18. In 2017, Vibes was again unable to meet its minimum wholesale sales obligations. See id. at ¶ 95.

Between June 19, 2017 and October 20, 2017, Al Jarrah represented to the plaintiff that IP Holdings would assist and support the plaintiff in dealing with www.souq.com, a large online marketplace. Id. at ¶ 163. Al Jarrah eventually provided the licensed marks to www.souq.com through a different licensee. Id. at ¶ 168.

In December 2017, Newman approached Vibes and sought the "Q4 advance royalty payment." Id. at ¶ 72. On December 11, 2017, Newman stated, "I am more than happy to seek approval of an extension of your current deal and the revised 2018-20 numbers but this cannot be at the expense of the 2017 Q4 minimum royalty." Id. at ¶ 73. Newman further indicated that, "[i]f we don't have receipt of the Q4 payment by December 31, 2017, I shall have no alternative but to send a breach letter to you which of course is a last resort." Id. at ¶ 74. The plaintiff paid the royalty, as well as all other minimum royalties for 2017. Id. at ¶ 77. On January 22, 2018, IP Holdings issued a letter to Vibes terminating the license agreement for not meeting the minimum wholesale sales obligations. Id. at ¶ 79.

On December 7, 2018, Vibes filed this action. Vibes brings causes of action against both defendants for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contractual relations, and tortious interference with prospective business advantage based on the

8

defendants' interactions with third-party customers of Vibes. The plaintiff also brings causes of action for fraud against both defendants and for negligent misrepresentation against Iconix based on various statements made regarding the defendants' relationship with Vibes.

III.

A.

IP Holdings moves to dismiss Vibes's claim for breach of contract.

To survive a motion to dismiss for a breach of contract claim under New York law, a complaint must allege "(1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of the contract by the defendant, and (4) damages resulting from the breach." R.H. Damon & Co., Inc. v. Softkey Software Products, Inc., 811 F. Supp. 986, 991 (S.D.N.Y. 1993).

Vibes has sufficiently alleged the first and fourth elements of a breach of contract claim. Vibes alleges that it entered into an exclusive license agreement with IP Holdings on November 29, 2013. SAC ¶ 39. Vibes also alleged that it has suffered damages, specifically marketing expenditures and lost profits, totaling no less than $16,117,500. Id. at ¶¶ 120-125.

Vibes has not alleged sufficiently the second element, namely that it duly performed on the contract. "[W]hen pleading

9

a claim for the breach of an express contract, . . . the complaint must contain some allegation that the plaintiffs actually performed their obligations under the contract." R.H. Damon & Co., 811 F. Supp. at 991. To plead due performance, the party pleading a claim for breach of contract must allege that it duly performed all duties under the contract. See Jasper & Black, LLC, v. Carolina Pad Co., LLC, No. 10-cv-3562, 2012 WL 413869, at *9 (S.D.N.Y. 2012). Vibes admits that it was unable to meet some of its obligations under the contract, namely its wholesale sales obligations for 2016 and 2017. Id. at ¶¶ 83, 95.[1] Therefore, the plaintiff has failed to plead that it adequately performed under the contract.[2]

Vibes has also failed to allege sufficiently the third element of breach of contract by IP Holdings. Vibes alleges that IP Holdings breached the agreement when IP Holdings allegedly

---

[1] To the extent that the plaintiff argues that the wholesale sales obligations provisions were waived or modified by the defendant when Newman, an IP Holdings representative, told the plaintiff "don't mind the minimum wholesale obligations as long as Vibes is paying Iconix the full Minimum Royalties obligations" (SAC ¶ 66), that argument is undermined by the plain terms of the license agreement. The agreement provides that it "may not be modified, discharged or terminated, nor may any of the provisions hereof be waived, orally." Weingart Decl., Ex. A, § 23.4; see also N.Y. Gen. Oblig. Law § 15-301(1) ("A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent.").

[2] The plaintiff attributes its inability to meet its wholesale sales obligations, in part, to several wars and revolutions in the relevant territory. SAC ¶ 143. Pursuant to the license agreement, such events could constitute cases of force majeure that would excuse Vibes from liability for failing to meet their wholesale sales obligations. See Weingart Decl., Ex. A, § 24. However, the plaintiff has not pleaded the force majeure clause as a basis for its non-performance of its obligations under the contract.

convinced Vibes's customers to cease doing business with them and to contract directly with IP Holdings. SAC ¶ 202. In support of its argument that IP Holdings breached the agreement, the plaintiff points generally to the exclusive nature of the agreement, as well as to § 1.2(b) which provides that "[n]othing herein shall be deemed to prevent [IP Holdings] or its affiliates or third party licensees from manufacturing or having manufactured Products bearing the Licensed Marks in the Territory, provided that such Products are not <u>sold</u> to customers located in the Territory except as otherwise permitted hereunder." Weingart Decl., Ex. A, § 1.2(b) (emphasis added). Although Vibes alleges that IP Holdings interfered with Vibes's customers in the territory, Vibes does not allege that IP Holdings, its affiliates, or third-party licensees ever sold products in the territory prior to terminating the agreement such that IP Holdings would be in breach of § 1.2(b) of the agreement.

Moreover, the agreement explicitly provides that IP Holdings may

> at any time during the Term negotiate and enter into agreements with third parties pursuant to which any of them may grant a license to use the Licensed Marks in connection with the manufacture, distribution and sale of Products in the Territory. . . . However, the first seasonal collection of Products bearing the Licensed Marks sold shall be a collection after the final collection sold by [Vibes] hereunder.

Id. § 23.3.

Vibes contends that IP Holdings breached the agreement because, although § 23.3 permits IP Holdings to enter into agreements with third parties generally, it does not permit IP Holdings to enter into agreements with Vibes's customers specifically. SAC ¶¶ 159-160.

Vibes's argument that its customers are not "third parties" within the meaning of § 23.3 of the agreement requires the Court to interpret the terms of the contract. "At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp., 830 F.3d 152, 156 (2d Cir. 2016). A contract term is unambiguous if "the contract language has a definite and precise meaning and concerning which there is no reasonable basis for a difference of opinion." Id. at 157 (internal quotation marks and alteration omitted). Ambiguity is determined by reference to the usual rules of contract interpretation in which words and phrases are given their usual meaning. See id. "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." Id. at 156 (internal quotation marks omitted).

In this case, the meaning of "third parties" is unambiguous. A third party is "[s]omeone who is not a party to [an agreement] but who is usu. somehow implicated in it; someone

12

other than the principal parties." Black's Law Dictionary (11th ed. 2019). Customers of Vibes, who are indisputably not parties to the license agreement between Vibes and IP Holdings, constitute "third parties" under the plain meaning of the contract. Therefore, IP Holdings was expressly permitted by the agreement to contact, negotiate with, and enter into agreements with Vibes's customers, which were "third parties" within the meaning of Section 23.3 of the agreement, provided that IP Holdings did not sell any exclusive products to those parties prior to "the final collection sold by" Vibes. Weingart Decl., Ex. A, § 23.3. As discussed above, the plaintiff has not alleged that IP Holdings actually sold any exclusive products to Vibes's customers prior to "the final collection sold by Vibes," and therefore Vibes has failed to plead that IP Holdings has breached any express provision of the agreement.

The plaintiff has failed to plead a claim for breach of contract against IP Holdings, and therefore the motion to dismiss the breach of contract claim against IP Holdings is **granted without prejudice**.

## B.

IP Holdings moves to dismiss the plaintiff's claim for breach of the implied covenant of good faith and fair dealing against IP Holdings.

13

"Implicit in every contract is a covenant of good faith and fair dealing which encompasses any promise that a reasonable promisee would understand to be included." <u>Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc.</u>, 949 N.Y.S.2d 115, 118 (App. Div. 2012). "Even if a party is not in breach of any express contractual obligations, it may be in breach of the implied duty of good faith and fair dealing . . . when it exercises a contractual right as part of a scheme to realize gains that the contract implicitly denies or to deprive the other party of the fruit (or benefit) of its bargain." <u>Id.</u> (citations and internal quotation marks omitted).

Vibes alleges that "[d]efendants, through their agents, communicated and met with [Vibes's] customers and convinced them to become independent licensees for the Ecko Unltd. brand, while eliminating [Vibes] from the process." SAC ¶ 203. According to Vibes, those interactions resulted in "the customers refus[ing] to continue doing business with Vibes, causing significant financial and economic losses to [Vibes]." <u>Id.</u> at ¶ 204. Allegedly, due to those financial losses, IP Holdings terminated the agreement with Vibes prior to the end of the contract term. <u>Id.</u> at ¶ 79.

Taken together, the allegations amount to a theory that IP Holdings diverted business away from Vibes that Vibes was entitled to under the agreement with IP Holdings. Although, as

14

explained above, Vibes has not alleged sufficiently that IP
Holdings was in breach of any express provision of the
agreement, Vibes has alleged sufficiently that it was deprived
of the fruit or benefit of their exclusive license and that the
defendants have acted in bad faith to circumvent the exclusivity
obligations in the agreement by approaching Vibes's customers,
which Vibes alleges was done for the purpose of ousting it from
its position as the exclusive carrier of the defendant's marks
in the territory. See Elmhurst Dairy, 949 N.Y.S.2d at 118
(holding that the plaintiff alleged adequately breach of the
covenant of good faith and fair dealing where it alleged that
the defendant "has diverted . . . business away from the
plaintiff . . . even though the plaintiff is entitled to that
business under the . . . contract."). Thus, Vibes has alleged
adequately that IP Holdings is in violation of its implied
pledge not to "do anything which will have the effect of
destroying or injuring the right of [Vibes] to receive the
fruits of the contract." Dalton v. Educ. Testing Serv., 663
N.E.2d 289, 291 (N.Y. 1995) (internal quotation marks omitted).[3]

---

[3] The defendants argue that the claim of breach of the covenant of good faith
and fair dealing is duplicative of the breach of contract claim. "New York
law . . . does not recognize a separate cause of action for breach of the
implied covenant of good faith and fair dealing when a breach of contract
claim, based upon the same facts, is also pled." Harris v. Provident Life &
Acc. Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002). "A claim for breach of the
implied covenant will be dismissed as redundant where the conduct allegedly
violating the implied covenant is also the predicate for breach of covenant
of an express provision of the underlying contract." Id. at 80 (citing ICD
Holdings S.A. v Frankel, 976 F. Supp. 234, 243-44 (S.D.N.Y. 1997)). As

IP Holdings' motion to dismiss the claim for breach of the covenant of good faith and fair dealing is **denied**.

## C.

Iconix moves to dismiss the plaintiff's claims for breach of contract and breach of the implied covenant of good faith and fair dealing against Iconix.

There is no allegation that Iconix was itself a party to the license agreement between Vibes and IP Holdings, and Iconix's name does not appear in the agreement. Weingart Decl. Ex. A, at 2. Therefore, consistent with general and well-settled principles of contract law, Iconix cannot be liable for any alleged breach of the contract between Vibes and IP Holdings or for breach of the implied covenant of good faith and fair dealing in connection with the contract. See MBIA Ins. Corp. v. Royal Bank of Canada, 706 F. Supp. 2d 380, 396 (S.D.N.Y. 2009) (collecting cases holding that generally a non-signatory cannot be held liable for breach of the contract); Schwartzco Enters. LLC v. TMH Mgmt., LLC, 60 F. Supp. 3d 331, 364 (E.D.N.Y. 2014) (same with respect to the breach of the implied covenant of good faith and fair dealing).

---

discussed above, the alleged conduct that gives rise to the breach of the covenant of good faith and fair dealing is not duplicative of the breach of contract claim because violation of that implicit obligation "is not inconsistent with other terms of the contractual relationship" between Vibes and IP Holdings. See Elmhurst Dairy, 949 N.Y.S.2d at 118-19.

Nevertheless, Vibes alleges that Iconix can be held liable under the agreement between Vibes and IP Holdings under an alter-ego theory. Vibes has failed to allege sufficiently that Iconix is liable under the contract under such a theory.

"[U]nder New York law a plaintiff may state a claim of breach of contract against a non-signatory where the plaintiff alleges adequately that the non-signatory was the 'alter-ego' of one or more of the signatories to the contract." Xiotech Corp. v. Express Data Products Corp., 11 F. Supp. 3d 225, 235-36 (N.D.N.Y. 2014) (internal citations omitted). A plaintiff "seeking to pierce the corporate veil on an alter ego theory bear[s] a 'heavy burden' in showing that defendants have perverted the privilege of doing business in a corporate form." Physicians Mut. Ins. Co. v. Greystone Servicing Corp., Inc., No. 07-CV-10490, 2009 WL 855648, at *3 (S.D.N.Y. Mar. 25, 2009) (citation omitted). Generally, a plaintiff asserting alter-ego liability must show that: "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in the plaintiff's injury." Xiotech, 11 F. Supp. 3d at 236 (citation and internal quotation marks omitted).

In deciding whether an entity exercised complete domination over a corporation, courts consider the following factors:

17

(1) the absence of the formalities and paraphernalia
that are part and parcel of the corporate existence,
i.e., issuance of stock, election of directors,
keeping of corporate records and the like, (2)
inadequate capitalization, (3) whether funds are put
in and taken out of the corporation for personal
rather than corporate purposes, (4) overlap in
ownership, officers, directors, and personnel, (5)
common office space, address and telephone numbers of
corporate entities, (6) the amount of business
discretion displayed by the allegedly dominated
corporation, (7) whether the related corporations deal
with the dominated corporation at arms length, (8)
whether the corporations are treated as independent
profit centers, (9) the payment or guarantee of debts
of the dominated corporation by other corporations in
the group, and (10) whether the corporation in
question had property that was used by other of the
corporations as if it were its own.

Id. (citation omitted).

In this case, the allegations that the plaintiff offers in
support of holding Iconix liable under the agreement on an alter
ego theory are that Iconix is the sole owner of IP Holdings and
that the two entities share employees and the same office. SAC
¶¶ 36-37, 44-45. Allegations of complete ownership, common
officers and personnel, and shared office space are, without
more, insufficient for the Court to infer that IP holdings was
controlled and dominated by Iconix to such a degree that IP
Holdings had no existence of its own. See, e.g., Jiangsu High
Hope Corp. v. Parigi Grp. Ltd., Nos. 17-CV-1570 & 17-CV-5366,
2018 WL 1603868, at *4 (S.D.N.Y. Mar. 29, 2018) ("The sharing of
an address coupled with a conclusory allegation, of dominance
simply is . . . not sufficient to state a claim based on veil-

piercing[.]"); <u>Physicians Mut. Ins. Co.</u>, 2009 WL 855648, at *4
("Allegations of 'shared common ownership' and 'senior
management responsibility' do not reach [the] requisite
threshold."); <u>Heitler v. Museum Print Editions, Inc.</u>, 337
N.Y.S.2d 255, 256 (App. Div. 1972) (per curiam) ("All that is
alleged . . . are facts showing interlocking directorships and
stockholdings and such in and of itself forms an insufficient
basis upon which to pierce the corporate veil."). There are no
allegations, for example, of an absence of corporate
formalities, undercapitalization, or orchestrated cash flow
between the companies. <u>See</u> <u>Physicians Mut. Ins. Co.</u>, 2009 WL
855648, at *4 (absence of formalities in corporate decision
making and inadequate capitalization considered under alter ego
theory); <u>see also</u> <u>Xiotech</u>, 11 F. Supp. 3d at 237 (same with
respect to orchestrated cash flow). There is no allegation that
Iconix used IP Holdings to perpetuate a fraud on the plaintiff.
Therefore, Vibes has not alleged sufficiently that Iconix is
liable under the agreement on a theory of alter ego liability.[4]

---

[4] Vibes also appears to argue that, separate from its veil-piercing argument,
Iconix can be liable under the agreement between IP Holdings and Vibes on the
ground that "[a] parent corporation may become a party to its subsidiary's
contract if the parent's conduct manifests an intent to be bound by the
contract. This intent can be inferred from the parent's participation in the
negotiation of the contract. A parent corporation that negotiates a contract
but has a subsidiary sign it can be held liable as a party to the contract,
if the subsidiary is a dummy for the parent corporation." <u>Warnaco Inc. v. VF
Corp.</u>, 844 F. Supp. 940, 946 (S.D.N.Y. 1994) (internal citation omitted). It
is unclear in what way this argument differs from the veil piercing theory
because the cases on which Vibes relies appear to find an intent to be bound
when the subsidiary was essentially a dummy corporation. <u>See</u> <u>id.</u> (holding

Accordingly, Vibes has failed to allege that Iconix was bound by the agreement between IP Holdings and Vibes under an alter-ego theory. Because Iconix is not liable for the agreement between IP Holdings and Vibes, Iconix also cannot be liable for a breach of the implied covenant of good faith and fair dealing. See Schwartzco Enters., 60 F. Supp. 3d at 364.

The defendants' motion to dismiss the contract-based claims against Iconix is therefore **granted without prejudice**.

**D.**

The defendants seek to dismiss the claim for fraud brought by Vibes against Iconix and IP Holdings.

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." Wynn v. AC Rochester, 273 F.3d 153, 156 (2d Cir. 2001) (per curiam). Moreover, Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud

---

that the plaintiff alleged adequately that the parent company manifested an intent to be bound by the agreement where the subsidiary "existed solely as an acquisition vehicle to acquire" the property underlying the dispute); Horsehead Indus. v. Metallgesellschaft AG, 657 N.Y.S.2d 632, 633 (App. Div. 1997) (holding that the parent company manifested an intent to be bound by the agreement where the subsidiary "had no purpose other than to hold . . . shares" central to the dispute). In any event, Vibes's allegations are insufficient to infer that Iconix manifested an intent to be bound by the contract entered into between Vibes and IP Holdings on a theory that Iconix operated IP Holdings as a dummy corporation.

. . . a party must state with particularity the circumstances
constituting fraud." Fed. R. Civ. P. 9(b). To satisfy this
requirement, a plaintiff "should specify the time, place,
speaker, and content of the alleged misrepresentations. In
addition, the complaint should explain how the
misrepresentations were fraudulent and plead those events which
give rise to a strong inference that the defendant had an intent
to defraud, knowledge of the falsity, or a reckless disregard
for the truth." Caputo v. Pfizer, Inc., 267 F.3d 181, 191 (2d
Cir. 2001) (alteration, citations, and internal quotation marks
omitted).

      Vibes alleges that six particular statements attributable
to the defendants constitute fraud. First, Vibes alleges that it
was fraud when on March 7, 2015, Legal Counsel and Director for
Iconix Alyssa Perlowitz sent a letter to the plaintiff
confirming that the plaintiff "is authorized on an exclusive
basis to manufacture, advertise, promote, market, distribute and
import" the licensed products in the territory even though, as
the plaintiff alleges, the defendants proceeded to oust the
plaintiff from its position as the exclusive carrier of the
defendant's marks in the territory. SAC ¶ 43 (emphasis omitted).
However, the plaintiff has not pleaded sufficiently that this
statement was false when it was uttered, nor that Perlowitz knew
it to be false or recklessly disregarded its falsity. Moreover,

21

because the statement merely restated the terms of the contract
by confirming the exclusivity provisions of the agreement, it
cannot qualify as a misrepresentation. See Manning v. Utils.
Mut. Ins. Co., 254 F.3d 387, 401 (2d Cir. 2001) ("[A]
misrepresentation, which is merely a statement of intent to
perform under the contract, cannot constitute fraud in New
York.").

Second, the plaintiff alleges that it was fraud when
Regional Representative for Iconix and IP Holdings Marc Newman
acknowledged to Vibes the violence and tumult in the territory
and told Vibes in November and December 2017 "don't mind the
minimum wholesale obligations as long as Vibes is paying to
Iconix the full Minimum Royalties obligations." SAC ¶¶ 61, 66.
Newman's implied promise to the plaintiff—that if Vibes paid the
royalties obligations but fails to meet the minimum wholesale
obligations, then IP Holdings would not terminate the agreement—
cannot support a claim of fraud because "[a] present expression
of the intent to perform a future act is actionable as fraud
only if 'actually made with a preconceived and undisclosed
intention of not performing it.'" Tanzman v. La Pietra, 778
N.Y.S.2d 199, 201 (App. Div. 2004) (quoting Sabo v. Delman, 143
N.E.2d 906, 908 (N.Y. 1957)). There are no non-conclusory
allegations to support an inference that Newman made the

22

statement in question with the then-present intent not to perform the implied promise.

The four remaining allegations of fraud are that: (1) on or about December 5, 2017, Newman stated that once the accounts receivable "are up to date," then the parties could continue conducting business, SAC ¶ 72; (2) various representatives of the defendants promised that they would no longer approach customers of the plaintiff, including during a visit to Beirut, Lebanon on March 24, 2017, id. at ¶¶ 87-90); (3) between on or about June 19, 2017 and on or about October 20, 2017, General Manager for Iconix and IP Holdings Abdullah Al Jarrah represented that the defendants would assist the plaintiff in dealing with www.souq.com, id. at ¶ 163; and (4) on or about March 24, 2017, the defendants assured the plaintiff that the relationship between the defendants and the plaintiff would "not be disturbed," id. at ¶ 173. These four statements are similarly non-actionable because they constitute promises of future performance with no accompanying allegation of a then-present intent not to perform. Without non-conclusory allegations that the defendant intended not to perform the promises implied in the allegedly fraudulent statements, the plaintiff has failed to allege with particularity under Rule 9(b) that the defendants made any fraudulent statements to the plaintiff.

In addition to failing to allege with particularity statements that were false, Vibes has failed to allege that it reasonably relied on any of the statements made by the defendants. Vibes alleges that it relied on the statements by "continu[ing] to operate its business by investing significant funds, time and effort into the Licensed Marks, including but not limited to marketing." Id. at ¶ 191. However, continued efforts to perform on a contract cannot give rise to an allegation of reasonable reliance because "one cannot be induced to tender a performance which is required as a part of a preexisting contractual obligation." Megaris Furs, Inc. v. Gimbel Bros., Inc., 568 N.Y.S.2d 581, 584 (App. Div. 1991) (collecting cases).

The plaintiff has failed to allege any statements that were known to be false by the speaker when spoken, and the plaintiff has failed to allege that it reasonably relied on any such statements. Therefore, the defendants' motion to dismiss the claim for fraud is **granted without prejudice**.

**E.**

The defendants seek to dismiss the plaintiff's claim of negligent misrepresentation against Iconix for failure to state a claim.

Under New York law, a claim of negligent misrepresentation "involves most of the same elements as fraud, with a negligence

24

standard substituted for the scienter requirement." Mia Shoes,
Inc. v. Republic Factors Corp., No. 96-cv-7974, 1997 WL 525401,
at *3 (S.D.N.Y. 1997). Liability for negligent misrepresentation
will be imposed on defendants only if those defendants "possess
unique or special expertise, or . . . are in a special position
of confidence and trust with the injured party such that
reliance on the negligent misrepresentation is justified."
Kimmell v. Schaefer, 675 N.E.2d 450, 454 (N.Y. 1996). "While the
existence of a special relationship is a fact-intensive, case-
by-case inquiry, courts have dismissed pleadings that contain
insufficient allegations on this point." Amusement Indus., Inc.
v. Stern, 786 F. Supp. 2d 758, 778 (S.D.N.Y. 2011) (internal
citation and quotation marks omitted).

        Vibes does not ground its claim for negligent
misrepresentation in any statements other than those which
formed a basis for the fraud claim. Vibes has failed to plead
adequately the fraud claim, not on the scienter element, but on
the falsity and reliance elements. Therefore, Vibes has failed
to plead adequately negligent misrepresentation on those same
elements. See Mia Shoes, 1997 WL 525401, at *3 ("Since there
appears to be no difference between the allegations of negligent
misrepresentation and the allegations of fraud, the negligent
misrepresentation claim must also be dismissed."). Moreover,
Vibes has failed to allege the existence of a special

25

relationship between itself and the defendants because, without more, an arms-length business transaction between sophisticated parties, such as is alleged to have existed between Vibes and the defendants in this case, does not constitute a "special relationship" for purposes of the tort of negligent misrepresentation. See Amusement Indus., 786 F. Supp. 2d at 779-80 (collecting cases).

Accordingly, the defendants' motion to dismiss the plaintiff's claim of negligent misrepresentation is **granted without prejudice**.

**F.**

The defendants seek to dismiss the plaintiff's claim of tortious interference with contractual relationships for failure to state a claim.

To state a claim for tortious interference with contractual relations under New York law, a plaintiff must allege "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." Kirch v. Liberty Media Corp., 449 F.3d 388, 401 (2d Cir. 2006) (quotation marks omitted).

The plaintiff has not alleged adequately the first element of a tortious interference with contract claim, namely a specific contract with a specified third party. The plaintiff alleges in conclusory terms that it had contractual relationships in the form of purchase orders with certain third parties in the territory that were canceled due to the defendants' interference. SAC ¶ 208. The Second Amended Complaint includes no other factual information regarding the purchase orders, such as when those contracts were formed or the major terms of the contracts. See Bose v. Interclick, Inc., No. 10-cv-9183, 2011 WL 4343517, at *10–11 (S.D.N.Y. Aug. 17, 2011) (dismissing a tortious interference with contract claim where plaintiff claimed generally that it had contracts with various parties, but did not specify "facts regarding the terms of the contracts or the specific parties to the contracts"); Berman v. Sugo LLC, 580 F. Supp. 2d 191, 208 (S.D.N.Y. 2008) (dismissing a claim that merely alleged that a contractual relationship with a third party existed, but set forth no facts about the kind of contract, whether it was nonexclusive, and whether it was valid). Without additional factual allegations regarding terms or specific parties to a contract, the existence of a valid contract cannot be determined. Without facts about the terms of the contract, it would be impossible for the plaintiff to allege that the defendants had induced third parties to breach those

terms. See Berman, 580 F. Supp. 2d at 203 (dismissing a claim for tortious interference with contractual relations where the existence of a contract had not been alleged).[5]

Therefore, the defendants' motion to dismiss the plaintiff's claim for tortious interference with contractual relations is **granted without prejudice**.

**G.**

The defendants seek to dismiss the plaintiff's claim of tortious interference with the plaintiff's prospective economic advantage.

"Under New York law, to state a claim for tortious interference with prospective economic advantage, the plaintiff must allege that '(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship.'" Kirch, 449 F.3d at 400 (2d Cir. 2006) (quoting Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003)). The plaintiff must allege that the defendant targeted some activities directed toward the third party and convinced the

---

[5] The lack of specific allegations about the agreements between Vibes and its customers is fatal to the claim for tortious interference with contract, but is not fatal to the claim for breach of the covenant of good faith and fair dealing, which, as explained above, is established in this case by the allegations that IP Holdings deprived Vibes of its exclusivity rights by approaching Vibes's customers.

third party not to enter into a business relationship with the
plaintiff. See Fonar Corp. v. Magnetic Resonance Plus, Inc., 957
F. Supp. 477, 482 (S.D.N.Y. 1997).

The third element requires that a defendant act with a
wrongful purpose or use wrongful means. See Carvel Corp. v.
Noonan, 818 N.E.2d 1100, 1104 (N.Y. 2004). In the case of
tortious interference with contractual relations, a plaintiff
may recover if the plaintiff can demonstrate that the
"defendant's deliberate interference result[ed] in a breach of
[the] contract." Id. (citation omitted). In the case of tortious
interference with prospective economic advantage, however, the
"plaintiff must show more culpable conduct on the part of the
defendant." Id. (citation omitted). Moreover, in order to
satisfy the third element of tortious interference with business
relations, "as a general rule, the defendant's conduct must
amount to a crime or an independent tort." Id. "Conduct that is
not criminal or tortious will generally be 'lawful' and thus
insufficiently 'culpable' to create liability for interference
with prospective contracts or other nonbinding economic
relations." Id.

In this case, the plaintiff has failed to plead adequately
tortious interference with prospective economic advantage
because the defendants' alleged actions do not constitute an

29

independent crime or tort.[6] Rather, as explained above, IP Holdings was authorized by the agreement to approach third parties.

Accordingly, the defendants' motion to dismiss the plaintiff's claim for tortious interference with prospective economic advantage is **granted without prejudice**.

**CONCLUSION.**

The Court has considered all the arguments of the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit. For the foregoing reasons, the defendants' motion to dismiss is **denied in part** and **granted in part**. The Clerk is directed to close all pending motions.

**SO ORDERED.**

Dated:   New York, New York
         June 8, 2020            _____/s/ John G. Koeltl_____
                                      John G. Koeltl
                                 United States District Judge

---

[6] The need for an independent crime or tort to establish a claim for tortious interference with prospective economic advantage distinguishes this claim from the claim that IP Holdings breached the covenant of good faith and fair dealing. The lack of good faith on the part of IP Holdings in approaching Vibes's customers and depriving Vibes of its exclusivity rights during the duration of the agreement may be a violation of the covenant of good faith and fair dealing implicit in the contract without being itself an independent tort.